PLANNED PARENTHOOD OF THE
COLUMBIA/WILLAMETTE,
INC.; et al., Plaintiffs,

v.

AMERICAN COALITION OF
LIFE ACTIVISTS; et
al., Defendants.

No. Civ. 95–1671–JO.

United States District Court,
D. Oregon.

March 16, 1999.

Carol J. Bernick, Davis Wright Tremaine, Portland, OR, Stephen S. Walters, Stoel Rives, Portland, OR, Elizabeth Maringer, Maria T. Vullo, Martin London, Paul Weiss Rifkind Wharton & Garrison, New York City, NY, Roger Evans, Planned Parenthood Federation of America Inc., New York City, NY, for Planned Parenthood of the Columbia/Willamette Inc., plaintiff.

Carol J. Bernick, Davis Wright Tremaine, Portland, OR, Stephen S. Walters, Stoel Rives, Portland, OR, Elizabeth Maringer, Maria T. Vullo, Martin London, Paul Weiss Rifkind Wharton & Garrison, New York City, NY, for Portland Feminist Women's Health Center, Robert Crist, MD, Warren M. Hern, MD, Elizabeth

Newhall, MD, James Newhall, MD, Karen Sweigert, MD, plaintiffs.

David T. Daulton, Berean Law Group PC, Norfolk, VA, Kevin L. Gibbs, Olmstead Gibbs & Harper, Seattle, WA, Mark Renart Peck, Law Office of Mark Renart Peck, Morristown, NJ, William D. Bailey, Lake Oswego, OR, for American Coalition of Life Activists, Advocates for Life Ministries, Andrew Burnett, David Crane, Catherine Ramey, Dawn Marie Stover, defendants.

Kevin L. Gibbs, Olmstead Gibbs & Harper, Seattle, WA, Mark Renart Peck, Law Office of Mark Renart Peck, Morristown, NJ, William D. Bailey, Lake Oswego, OR, for Michael Bray, Charles Roy McMillan, Bruce Evan Murch, defendants.

Mark Belz, Belz & Jones PC, St. Louis, MO, Kevin L. Gibbs, Olmstead Gibbs & Harper, Seattle, WA, Michael R. Hirsh, Hirsh & Heuser PC, Canton, GA, Mark Renart Peck, Law Office of Mark Renart Peck, Morristown, NJ, William D. Bailey, Lake Oswego, OR, for Timothy Paul Dreste, Joseph L. Foreman, Charles Wysong, defendants.

Michael P. Tierney, Legal Center for the Defense of Life, New York City, NY, David T. Daulton, Berean Law Group PC, Norfolk, VA, John M. McSherry, Legal Center for Defense of Life, New York City, NY, James M. Bendell, Law Office of James M. Bendell, Port Townsend, WA, Norman L. Lindstedt, Norman L. Lindstedt, PC, Portland, OR, Richard J. Traynor, Law Office Richard J. Traynor, Morristown, NJ, for Michael Dodds, Stephen P. Mears, defendants.

Chris Ferrara, American Catholic Lawyers Association, Fairfield, NJ, James M. Bendell, Norman L. Lindstedt, Norman L. Lindstedt, PC, Portland, OR, Richard J. Traynor, Law Office Richard J. Traynor, Morristown, NJ, for Monica Migliorino Miller, defendant.

Chris Ferrara, American Catholic Lawyers Association, Fairfield, NJ, James M. Bendell, Richard J. Traynor, Law Office Richard J. Traynor, Morristown, NJ, Mark Renart Peck, Law Office of Mark Renart

Peck, Morristown, NJ, for Donald Treshman, defendant.

Michael H. Simon, Chin See Ming, Perkins Coie, Portland, OR, for American Civil Liberties Union Foundation of Oregon, Amicus.

Henry Kane, Beaverton, OR, movant pro se.

Paul deParrie, Portland, OR, movant pro se.

## AMENDED ORDER AND PERMANENT INJUNCTION

ROBERT E. JONES, District Judge.

Plaintiffs, Dr. Robert Crist, Dr. Warren Hern, Dr. Elizabeth Newhall, Dr. James Newhall, Planned Parenthood of the Columbia/Willamette, Inc. and Portland Feminist Women's Health Center, doing business as All Women's Health Services (collectively "plaintiffs"), commenced this action seeking a permanent injunction, damages and other relief. The trial before the jury having been concluded, and the jury having found that defendants did issue true threats against plaintiffs, and this Court having found that plaintiffs are without an adequate remedy at law, the Court makes the following findings of fact and conclusions of law:

### FINDINGS OF FACT

I. *The Threats*

A. *The "Deadly Dozen" Poster*

1. The Deadly Dozen poster, trial exhibit 1, is a true threat to bodily harm, assault, or kill one or more of the plaintiffs.

2. The Deadly Dozen poster was created by the American Coalition of Life Activists ("ACLA") and first published in or around Washington, D.C. on January 22, 1995. (Ex. 1; Tr. 1352, 1385)

3. Defendants Michael Bray, Andrew Burnett, David Crane, Michael Dodds, Joseph Foreman, C. Roy McMillan, Bruce Murch, Catherine Ramey, Dawn Stover,

Donald Treshman and Charles Wysong attended the ACLA event where the Deadly Dozen poster was unveiled. (Answer of defendants American Coalition of Life Activists, Advocates for Life Ministries, Michael Bray, Andrew Burnett, David Crane, Timothy Dreste, C. Roy McMillan, Bruce Murch, Catherine Ramey, Dawn Stover and Charles Wysong ("ACLA Answer") ¶ 40; Tr. 1254, 1356, 1493–94) Defendant Dreste ratified the poster's release. (Tr. 1170, 2486) Defendant Advocates for Life Ministries ("ALM") republished the poster in its magazine *Life Advocate.* (Ex. 3) Defendant Murch republished the poster in his publication, *Salt & Light.* (Ex. 2) Defendants also republished the poster at later ACLA events.

4. The Deadly Dozen poster was unveiled at the event in blown-up form. (Tr. 1357)

5. The Deadly Dozen poster lists thirteen physicians. Three of the plaintiffs are specifically named with their place of residence: Dr. Elizabeth Newhall, Dr. James Newhall and Dr. Warren Hern. (ACLA Answer ¶ 41; Ex. 1; Tr. 1254–55)

6. In addition to their names and the city in which they reside, the Deadly Dozen poster lists the home address of Drs. James and Elizabeth Newhall. (ACLA Answer ¶ 41; Ex. 1; Tr. 1254–55)

7. The Deadly Dozen poster lists the name and home address of Dr. George Kabacy, a doctor who at the time provided abortions at plaintiff, Planned Parenthood of the Columbia/Willamette, Inc. ("Planned Parenthood"). (Ex. 1; Tr. 477)

8. Also listed on the Deadly Dozen poster is Dr. Joseph Booker of Jackson, Mississippi, who had been a target of ACLA protests during ACLA's first event in Jackson, Mississippi, in August 1994. (Ex. 1, Tr. 970–71)

9. Also listed on the Deadly Dozen poster is the name and address of Dr. George Tiller of Kansas. Dr. Tiller was shot in both arms in August 1993 by Shelley Shannon of Grants Pass, Oregon. Shannon had been to Wichita before, and had protested Dr. Tiller, along with defen-dants Andrew Burnett and Catherine Ramey. (Ex. 51) At the time Shannon shot Dr. Tiller, she had in her possession copies of *Life Advocate* magazine (published by defendant ALM) with information about Dr. Tiller. (Tr. 1080) Among those who signed a petition supporting the acquittal of Shannon were defendants ALM, Bray, Burnett, Dodds and McMillan. (Ex. 52; Tr. 1491) Defendant Dawn Stover publicly supported Shannon on national television. (Tr. 2456) In his October 1993 editorial for *Life Advocate,* defendant Burnett stated "Shelley was a courageous women [*sic*] that we were very proud to be associated with." (Ex. 51)

10. The day after the Deadly Dozen poster was released, the Federal Bureau of Investigation contacted the doctors named on the list, notified them of their need to take safety measures and offered 24–hour personal protection of the U.S. Marshal Service for the doctors and their families. (Tr. 568–69) Calls from the U.S. Marshals and other law enforcement followed. (Tr. 236, 624) Plaintiffs heeded these warnings.

### B. *The Poster of Dr. Robert Crist*

11. The Poster of Dr. Robert Crist, trial exhibit 5, is a true threat to bodily harm, assault or kill one or more of the plaintiffs.

12. The Poster of Dr. Robert Crist displays a photograph of Dr. Crist, and his home and business addresses. (ACLA Answer ¶ 48b; Ex. 5; Tr. 1257)

13. The Poster of Dr. Crist was created and first published by ACLA during its event in St. Louis, Missouri in August 1995. (ACLA Answer ¶ 48b; Ex. 5; Tr. 608, 899, 1257)

14. Defendants Andrew Burnett, David Crane, Timothy Dreste, C. Roy McMillan, Catherine Ramey, Dawn Stover and Charles Wysong attended the ACLA event where the Poster of Dr. Crist was unveiled. The other defendants assisted in planning the event and the poster and/or

ratified its release. (ACLA Answer ¶ 47c; Tr. 1228, 1257, 1494–95)

15. Immediately after the poster was released, Dr. Crist was informed by the St. Louis police that he should take additional security precautions. (Tr. 1104) Dr. Crist followed that advice. (Tr. 1110)

### C. *The Nuremberg Files*

16. The "Nuremberg Files," trial exhibits 7 and 9, are a true threat to bodily harm, assault or kill one or more of the plaintiffs.

17. The Nuremberg Files list the names and contain personal information on abortion providers, clinic employees and clinic owners, law enforcement officials involved in securing access to abortion services, judges, politicians, and abortion rights supporters. (Ex. 7, Tr. 2283)

18. Dr. Robert Crist appears in the Nuremberg Files. (Exs. 7A, 7B, 7C; Tr. 1116–17)

19. Dr. Warren Hern appears in the Nuremberg Files. (Exs.7A, 7B, 7C) A photograph of Dr. Warren Hern appears in the Nuremberg Files along with the address and telephone numbers of his medical offices. (Exs. 7A, 7E; Tr. 2296)

20. Dr. Elizabeth Newhall appears in the Nuremberg Files. (Exs. 7A, 7B, 7C; Tr. 286)

21. Dr. James Newhall appears in the Nuremberg Files. (Exs.7A, 7B, 7C)

22. At one time, defendants possessed a hard copy version of the Nuremberg Files, including one of Dr. James Newhall. (Ex. 9) These files have since been destroyed by defendants and/or their agents during the course of this lawsuit and were therefore not produced to plaintiffs.

23. The names of several doctors and employees of plaintiff Planned Parenthood appear in the Nuremberg Files: Dr. George Kabacy (also named on the Deadly Dozen poster), Dr. Mark Nichols (Planned Parenthood's medical director), Dr. Gary Prohaska (a former chair of Planned Parenthood's medical committee), and Allie Stickney (Planned Parenthood's former executive director). (Exs. 7A, 7B, 7C; Tr. 529)

24. The (now former) executive director of plaintiff Portland Feminist Women's Health Center ("Portland Feminist"), Jude Hanzo, is listed and featured in the Nuremberg Files. (Ex. 7A, 7D) The hard copy version of this file has since been destroyed by defendants and/or their agents during the course of this lawsuit and was therefore not produced to plaintiffs.

25. The names of doctors and clinic workers and security personnel who have been killed during attacks on abortion clinics are listed in the Nuremberg Files with strikes through their names. (Ex. 7A; Tr. 2258) Those wounded, such as Dr. Tiller, are shaded in gray. (Ex. 7A; Tr. 2258)

26. The FBI contacted plaintiffs to notify them that they appear in the Nuremberg Files and advised them to take safety precautions. (Ex. 28; Tr. 286–87, 1523)

27. The Nuremberg Files were unveiled in hard copy form by ACLA, with the assistance of Paul deParrie, at ACLA's January 1996 event in Washington, D.C. (Exs. 80, 81, 82; Tr. 1362–63)

28. Defendants Burnett and Crane organized the project with deParrie prior to the event. (Tr. 2815) The other defendants approved of the project and agreed to its commission.

29. Defendants Bray, Burnett, Crane, Dodds, Dreste and Wysong attended the January 1996 ACLA event at which the Nuremberg Files were unveiled. (Tr. 608, 970, 1361, 1495, 2053, 2729) Defendant Murch planned to attend, but at the last minute was unable to attend. (Tr. 2604–05)

30. At the January 1996 ACLA event, a "box" of Nuremberg Files was displayed. (Tr. 2066)

31. The Nuremberg File of Dr. Prohaska was displayed at the January 1996 ACLA Event. (Ex. 4)

32. Soon after the January 1996 ACLA event, Neal Horsley received hard copy

Nuremberg Files from Paul deParrie. (Ex. 4; Tr. 424, 2245) Horsley received two shipments of at least 22 hard copy files to be posted on the Internet. (Tr. 2329) These files included the files of Dr. Prohaska and Ms. Hanzo. The defendants have not identified by name the other hard copy files that existed but have since been destroyed.

33. The cover letter on the first shipment of files bore ACLA's name and P.O. box and summarized the Nuremberg Files project. (Tr. 2331) Horsley copied that information when he placed the Nuremberg Files on the Internet.

34. ACLA's name appeared on the Nuremberg Files Internet website in its initial format. (Ex. 7B)

35. The Nuremberg Files website makes it clear that any information kept by ACLA and/or Neal Horsley will be kept away from legal authorities. The website declares: "the evidence collected will be forwarded to several secure locations so that pro-abortion forces will not be able to destroy the evidence and prevent its future use." (Ex. 7B) This statement remained on later versions of the website. (Ex. 7A)

36. After Horsley published the ACLA Nuremberg Files on the Internet, Horsley shipped the hard copy files to an undisclosed location at the request of Paul deParrie. (Tr. 2371)

37. None of the defendants produced any Nuremberg Files during the course of discovery in this lawsuit, despite the fact that they were in defendants possession after this lawsuit was filed in October 1995 and were called for by discovery requests. Neither Horsley nor deParrie produced any Nuremberg Files pursuant to the subpoenas served on them. (Tr. 2374, 2875–76)

II. *Defendants Released Their Threats into a Known Atmosphere of Violence Against Abortion Providers*

38. On March 10, 1993, Dr. David Gunn was shot and killed outside of the Pensacola, Florida clinic where he performed abortions. (ACLA Answer ¶ 55a; Tr. 1258, 2474) Michael Griffin has been convicted of this murder.

39. Prior to his murder, Dr. Gunn's name, photograph and other personal identifying information appeared on WANTED posters. (ACLA Answer ¶ 53; Exs. 11, 12, 13; Tr. 939, 1257, 1497)

40. By January 1995, plaintiffs were aware of this murder and the posters that preceded it. (Exs. 133, 144; Tr. 365, 1508)

41. By January 1995, defendants knew of the murder of Dr. David Gunn and of the posters that preceded his death. (Exs. 57, 133, 144; Tr. 1508)

42. Defendants Michael Bray, Andrew Burnett, David Crane, Michael Dodds, Joseph Foreman, C. Roy McMillan, Catherine Ramey and Dawn Stover signed a "Defensive Action" petition circulated by Paul Hill declaring the murder of Dr. Gunn justifiable and calling for Griffin's acquittal. (Ex. 41A–41D)

43. Defendant Donald Treshman issued a press release on the morning Dr. Gunn was murdered, announcing a fund supporting Michael Griffin. (Ex. 40)

44. Within days of the murder of Dr. Gunn, defendant Timothy Dreste stood outside of an abortion clinic where Dr. Yogendra Shah performed abortions and held up a sign that read: "Dr. Shah, do you feel under the Gunn?" (Ex. 149)

45. On August 21, 1993, Dr. George Patterson, an abortion provider, was shot and killed in Mobile, Alabama. (Foreman Answer ¶ 58; Tr. 356, 1508)

46. Prior to Dr. Patterson's murder, his name, physical description and address were published on a "WANTED" poster. (ACLA Answer ¶ 56a; Ex. 14; Tr. 356, 1258, 1508)

47. Defendants knew of the murder of Dr. Patterson. (Ex. 51)

48. Plaintiffs knew of the murder of Dr. Patterson and the poster that preceded it. (Tr. 357, 1197, 1508)

49. On July 29, 1994, Dr. John Bayard Britton, the doctor who had replaced Dr. Gunn and provided abortions at the same clinic where Dr. Gunn was murdered, was shot and killed along with his volunteer escort, James Barrett, while entering another Pensacola clinic. (ACLA Answer ¶ 68a; Ex. 60; Tr. 1132, 1259, 2503) Mrs. Barrett, James Barrett's wife, was wounded in the attack. (ACLA Answer ¶ 68a; Tr. 761, 1259)

50. Prior to his murder, Dr. Britton's name, photograph and physical description appeared on "unWANTED" posters. (ACLA Answer ¶ 66; Exs. 15, 16, 17; Tr. 771–75, 1258) These posters contained the phrase "Crimes Against Humanity," also found on the Deadly Dozen poster, the Poster of Dr. Robert Crist and the Nuremberg Files. (Exs.1, 5, 7, 15, 16, 17)

51. Prior to these murders, defendants Burnett and Ramey visited John Burt in Pensacola, Florida. Burt had created the poster of Dr. Gunn and was one of the persons who had also prepared the posters of Dr. Britton along with Paul Hill. They discussed "wanted" posters at this meeting. (Exs. 57, 144; Tr. 785–88) Hill and Burt were videotaped taking photographs for the poster of Dr. Britton. (Ex. 109; Tr. 763–72)

52. Paul Hill has been convicted of the murder of Dr. Britton and Mr. Barrett, and the attempted murder of Mrs. Barrett. (Exs. 60, 109; Tr. 763–64; 770–76, 786)

53. By January 1995, defendants were aware of the murder of Dr. Britton and the posters that preceded it. (Exs. 57, 58, 60, 144; Tr. 947, 958)

54. By January 1995, plaintiffs were aware of the murder of Dr. Britton and the posters that preceded it. (Ex. 144; Tr. 241, 648–49, 1142)

55. Defendants Bray, Burnett, Crane, McMillan, Ramey and Stover signed a petition calling for the acquittal of Paul Hill. (ACLA Answer ¶ 67; Ex. 61; Tr. 1259) The petition was identical to that circulated by Hill in support of Michael Griffin. (Ex. 41)

56. Defendant McMillan, three months after the murder of Dr. Britton, called Paul Hill "a patriot," and a "wonderful man" who had "fired the first shots in this war." (Tr. 791)

57. ALM and its editor-in-chief, Paul deParrie, publicly praised Paul Hill after he was convicted of murder and sentenced to death and encouraged others to follow his lead: "The man's a hero. May his tribe increase." (Ex. 65)

58. These murders were not isolated events. Violence in the anti-abortion movement continued, as chronicled in defendant ALM's magazine *Life Advocate*.

59. In August 1993, just two days prior to the murder of Dr. Patterson, Dr. George Tiller was shot in both arms by Shelley Shannon. (Tr. 1079) Shelley Shannon was a close friend and associate of the defendants. (Tr. 874, 1079–81) Shannon also later pleaded guilty to arson and butyric acid attacks on eight abortion facilities, including Portland Feminist's Eugene, Oregon clinic. (ACLA Answer ¶ 62a; Tr. 1079, 1261)

60. In November 1994, in Vancouver, Canada, Dr. Garson Romalis, an abortion provider, was shot by a sniper with a high-powered rifle at close range. He was having breakfast in his home at the time. (Tr. 637)

61. By January 1995, plaintiffs were aware of the sniper shooting of Dr. Romalis. (Tr. 637–38)

62. By January 1995, defendants were aware of the shooting as well. Defendant Treshman praised the shooting of Dr. Romalis on national television, stating "I would say that that was certainly the superb tactic. It was certainly far better than anything that was seen in the States because the shooting was done in such a way that the perpetrator got away. I would think more abortionists would quit as a result of it." (Ex. 113)

63. Soon thereafter, on December 30, 1994, John Salvi murdered two clinic workers and wounded five others at two clinics

in Brookline, Massachusetts. One of the clinics in Brookline was a Planned Parenthood clinic. (Tr. 290–91, 407)

64. Immediately following the shootings in Massachusetts, Salvi drove to Norfolk, Virginia and fired shots into the windows of the Hillcrest Clinic in Norfolk. (Tr. 407, 1339)

65. Defendant David Crane was present outside of the Hillcrest Clinic on the morning John Salvi fired the shots. (Tr. 1340–41)

66. Defendant Michael Bray had been convicted and served four years in federal prison for conspiracy to bomb seven abortion facilities including the Hillcrest Clinic. (Ex. 744; Tr. 1260)

67. More physicians who perform abortions in Canada have been shot by snipers since the sniper shooting of Dr. Romalis.

68. In January 1998, a bomb in Birmingham, Alabama killed an off-duty police officer and maimed a nurse who worked at the clinic.

69. Defendant McMillan referred to the Birmingham bombing as "a righteous act." (Ex. 114) Defendant Bray likewise defended this violence on national television. (Ex. 112)

70. In October 1998, in his home outside of Buffalo, New York, Dr. Barnett Slepian, a doctor who performed abortions, was shot and killed by a sniper. (Tr. 636–37)

71. Dr. Slepian's name is crossed out on the Nuremberg Files website. (Ex. 7A; Tr. 2258–59)

72. Violence against abortion providers has continued through today.

## III. *The Defendants*

### A. *American Coalition of Life Activists ("ACLA")*

73. ACLA is a coalition of people and organizations that held its first official event in August 1994 in Jackson, Mississippi. ACLA was formed in 1994 following a meeting in Chicago in April 1994 during which there was a split in the pro-life movement over the use of force. Defendants, many of whom had signed the Defensive Action petition approving the murder of Dr. Gunn, refused to commit to nonviolence. Because they advocated the use of "force" and justifiable homicide, they were no longer allowed to be leaders of Operation Rescue and therefore agreed to form a new organization that became ACLA. (ACLA Answer ¶ 17c; Tr. 837, 1246, 1474, 1561–64)

74. ACLA's position on violence against abortion providers is clear. In the words of ACLA co-founder and regional director and ALM executive director, defendant Andrew Burnett, "if someone was to condemn any violence against abortion, they probably wouldn't have felt comfortable working with us." (Tr. 829–30)

75. ACLA was founded by defendants Andrew Burnett, Joseph Foreman and C. Roy McMillan. (ACLA Answer ¶¶ 20a, 24a, 25a; Tr. 1247–48, 1251–52)

76. Defendant David Crane is the president and national director of ACLA. (ACLA Answer ¶ 2; Tr. 1245)

77. Defendant Andrew Burnett is the Regional Director of ACLA for the Northwest region. (ACLA Answer ¶ 20a; Tr. 1247–48)

78. Defendant Timothy Dreste is the Regional Director of ACLA for the Central Midwest Region. (ACLA Answer ¶ 22a; Tr. 1251)

79. Defendant Michael Dodds was the Regional Director of ACLA for the South Central Region during the relevant time, and remains an active member of ACLA. (ACLA Answer ¶ 23a; Tr. 1251)

80. Defendant Bruce Murch was a regional director of ACLA for the Northeast Region during the relevant time, and remains an active member of ACLA. (ACLA Answer ¶ 27a; Tr. 1252)

81. Defendant Donald Treshman was a regional director of ACLA for the Southwest region during the relevant time, and

remains an active member of ACLA. (ACLA Answer ¶ 31a; Tr. 1253)

82. Defendant Charles Wysong is the Regional Director of ACLA for the Southeast region. (ACLA Answer ¶ 32a; Tr. 1253)

83. Defendant Joseph Foreman drafted the ACLA Constitution. (Tr. 2203)

84. None of the defendants has ever disapproved of or disassociated with the goals or activities of ACLA.

85. In January 1995, ACLA unveiled the Deadly Dozen poster at its event in the Washington, D.C. area. (ACLA Answer ¶ 40a; Ex. 2; Tr. 1254)

86. In August 1995, ACLA unveiled the Poster of Dr. Robert Crist at its event in St. Louis. (ACLA Answer ¶ 48b; Ex. 5; Tr. 1257)

87. At the St. Louis event, ACLA also unveiled and circulated posters of other abortion providers and reproductive health facilities. (Exs. 6, 18, 19, 409; Tr. 1173)

88. Prior to its St. Louis event, ACLA prepared to issue a "Contract on the American Abortion Industry." (Ex. 76)

89. In January 1996, ACLA unveiled the Nuremberg Files, which were subsequently posted on the Internet. (Exs. 80, 81; Tr. 1180, 1361, 1556, 1560)

90. ACLA republished the Deadly Dozen poster at its events in August 1995 and January 1996, and included it in its mailings (Tr. 1180, 1361, 2445)

91. ACLA uses intimidation as a means of interfering with the provision of reproductive health services.

92. Defendant American Coalition of Life Activists ("ACLA") violated or conspired to violate FACE. (Verdict at 3)

93. ACLA is an enterprise that engaged in a pattern of racketeering activity under RICO.

94. ACLA injured each plaintiff in the amount of compensatory damages awarded by the jury. (Verdict at 3)

B. *Advocates for Life Ministries ("ALM").*

95. ALM was involved in the formation of ACLA, coordinates its Northwest region, and is an active ACLA member. (ACLA Answer ¶ 18b; Tr. 838, 1247)

96. ALM provided its telephone and fax numbers and address for ACLA mailings. (Tr. 836, 1055, 1057–58)

97. ALM publishes *Life Advocate* magazine. (ACLA Answer ¶ 18c; Tr. 1247)

98. Andrew Burnett is the executive director of ALM and the publisher of *Life Advocate.* (ACLA Answer ¶ 20b; Tr. 793, 863, 1051, 1248)

99. Defendants Catherine Ramey and Dawn Stover are associate directors of ALM. (ACLA Answer ¶¶ 29a, 30a; Tr. 979, 1252–53, 2429)

100. *Life Advocate*'s editor-in-chief is Paul deParrie. (Tr. 1051, 2511)

101. ALM published defendant Michael Bray's book, *A Time to Kill.* (Exs. 63, 744; Tr. 936–37)

102. According to ALM, defendant Bray's book "shows the connection between the [justifiable homicide] position and clinic destruction and the shootings of abortionists." (Ex. 63)

103. In *Life Advocate,* ALM advertises and sells defendant Bray's "EXECUTE Murderers, Abortionists" bumper stickers. (Exs. 10, 66)

104. Subscribers have asked to be removed from *Life Advocate*'s mailing list because of the magazine's endorsement of the use of force. (Exs. 51, 66, 67, 68; Tr. 1090)

105. ALM republished the Deadly Dozen poster in the March 1995 issue of *Life Advocate.* (Ex. 3)

106. ALM has featured Michael Griffin, Paul Hill and Shelley Shannon on the cover of *Life Advocate* magazine. (Exs. 51, 52, 60; Tr. 916)

107. Shelley Shannon had in her possession several issues of *Life Advocate* fea-

turing articles and photographs of Dr. George Tiller when she shot him in August 1993. (Ex. 45, 47; Tr. 1079–80) Shannon had the magazines so she could identify Dr. Tiller, his vehicle and his clinic. (Tr. 1080)

108. ALM endorsed Shelley Shannon's shooting of Dr. Tiller. (ACLA Answer ¶ 62b; Ex. 51; Tr. 1261)

109. Defendant Ramey, associate director of ALM, destroyed ALM documents and deleted material from ALM's computers since this litigation commenced and plaintiffs served requests for the production of documents on both ALM and Ramey. (Tr. 2513–14)

110. The September 1993 *Life Advocate* noted that an "unwanted poster" of Dr. Britton was in the process of being prepared by Paul Hill and others, and described the activities of Hill and others in identifying and surveilling Dr. Britton. (Ex. 57)

111. In that same article, ALM commented on the murder of Dr. David Gunn, noting that it "sent waves of fear through the ranks of abortion providers across the country. As a result, many more doctors quit out of fear for their lives, and the ones who are left are scared stiff." (Ex. 57)

112. Multiple telephone calls with other defendants to and from ALM's offices took place during the time surrounding ACLA's April 1995 event in Wichita, Kansas. (Ex. 94)

113. Multiple telephone calls with other defendants to and from ALM's office took place during the time surrounding ACLA's August 1995 event, at which the Poster of Dr. Robert Crist was unveiled. (Ex. 94)

114. Multiple telephone calls with other defendants to and from ALM's office took place during the time surrounding ACLA's January 1996 event, at which the Nuremberg Files were unveiled. (Ex. 94)

115. ALM advertised and promoted the White Rose Banquets in *Life Advocate*. (Ex. 79, 84; Tr. 969)

116. ALM advertised and promoted other ACLA events in *Life Advocate*.

117. ALM maintained the hard copy Nuremberg Files at the *Life Advocate* offices during the course of this lawsuit. (Ex. 9; Tr. 978, 2887)

118. ALM uses intimidation as a means of interfering with the provision of reproductive health services.

119. ALM has never disassociated itself with, nor expressed disapproval of, any of ACLA's activities.

120. Defendant Advocates for Life Ministries ("ALM") violated or conspired to violate FACE. (Verdict at 4)

121. ALM violated or conspired to violate RICO. (Verdict at 4)

122. ALM injured each plaintiff in the amount of compensatory damages awarded by the jury. (Verdict at 4)

### C. Michael Bray

123. Defendant Bray attended the ACLA planning meeting in Bowie, Maryland in November 1994. (Tr. 2029)

124. Defendant Bray attended the ACLA event in Washington, D.C. in January 1995 at which the Deadly Dozen list was unveiled. (ACLA Answer ¶ 40b; Tr. 967, 1254, 1284)

125. At that event, defendant Bray sold copies of his book, *A Time to Kill*. (Tr. 2622)

126. Defendant Bray's book was published by ALM and commissioned by defendant Andrew Burnett. (Tr. 1071)

127. Defendant Bray had multiple telephone discussions with other defendants during the time surrounding ACLA's August 1995 event, at which the Poster of Dr. Robert Crist was unveiled. (Ex. 94)

128. Defendant Bray attended an ACLA planning meeting in Bowie, Maryland in November 1995 prior to ACLA's January 1996 event at which the Nuremberg Files were unveiled. (Tr. 2029)

129. Defendant Bray had multiple telephone discussions with other defendants during the time surrounding ACLA's Jan-

uary 1996 event, at which the Nuremberg Files were unveiled. (Ex. 94)

130. Defendant Bray hosted the annual White Rose Banquets in January 1996 and January 1997 during which ACLA activities were discussed. (Tr. 609–10, 1495)

131. The White Rose Banquet is part of the ACLA January event each year. (Ex. 78, 79, 80, 81, 82, 84)

132. The White Rose Banquet honors people who have been imprisoned for their violent anti-abortion activities. (Tr. 1373)

133. The White Rose calendar, published by defendant Murch and distributed at the White Rose Banquet, contains photos and otherwise commemorates anti-abortion violence and its perpetrators. (Ex. 83)

134. Defendant Bray publishes a newsletter, *Capitol Area Christian News*. (Tr. 601)

135. Defendant Bray, in his September 1993 newsletter, wrote an article describing "unwanted" posters of Dr. John Britton. (Ex. 58; Tr. 611)

136. Defendant Bray signed Paul Hill's petition calling for the acquittal of Shelley Shannon. (Ex. 52)

137. Defendant Bray drafted and signed Paul Hill's justifiable homicide petition calling for the acquittal of Michael Griffin. (Ex. 41; Tr. 604)

138. Defendant Bray drafted and signed an identical justifiable homicide petition calling for the acquittal of Paul Hill. (Ex. 61; Tr. 605)

139. In June 1993, defendant Bray spoke at an event in Oklahoma City sponsored by defendant Treshman in favor of the use of force. (Tr. 894–95)

140. At the Oklahoma City event, defendant Bray displayed a sign reading "EXECUTE Murderers, Abortionists." (Ex. 304; Tr. 894–95)

141. Defendant Bray also created a bumper sticker that states "EXECUTE Murderers, Abortionists." (Ex. 10) He advertises the bumper sticker in *Life Advocate* as well as in *Capitol Area Christian News*. (Exs. 10, 66)

142. Defendant Bray advocates and promotes the use of force against abortion providers. In a televised interview, he stated "There are times when there is justified killing. We hear of terminating pregnancies. Terminating abortionists, I think is appropriate. Use level language. Human beings, the unborn is a human being. If we are going to speak of terminating pregnancies, we can speak of terminating abortionists." (Ex. 111)

143. In the September 1993 issue of his *Capitol Area Christian News*, Bray discussed one doctor's decision to quit performing abortions following a "Not Wanted" poster prepared and circulated by defendant David Crane and republished in Bray's publication. Bray wrote that although the doctor "declined to give the reason for his decision, it is clear to all who possess faculties capable of inductive analysis: he was bothered and afraid." (Ex. 58)

144. Defendant Bray placed the words "Army of God" on a sign at the Hillcrest Clinic in Norfolk, Virginia, an abortion facility bombed by Bray. (ACLA Answer ¶ 78; Tr. 603)

145. Defendant Bray discussed his copy *Army of God Manual* in the November 1995 *Life Advocate*. In that article, Bray discusses how he "traded" his copy of the *Army of God Manual* for a U.S. Army manual on sniper training. (Ex. 88)

146. Defendant Bray has refused to commit to stop using force in connection with his anti-abortion activities. (Tr. 604)

147. Defendant Bray stated in USA Today: "Anyone who truly believes that the slaughter of children is what we have with abortion could go out and shoot an abortion provider." (Ex. 87)

148. Defendant Bray was present when the Nuremberg Files were unveiled at the January 1996 ACLA event. (Tr. 608)

149. Defendant Bray was part of the discussions with Neal Horsley and others about placing the Nuremberg Files on the Internet. (Tr. 2239)

150. Defendant Bray, in his Fall 1997 issue of *Capitol Area Christian News,* informed his readers that Neal Horsley was collecting names and information for the Nuremberg Files. (Ex. 90)

151. Defendant Bray sees benefits from the atmosphere of violence to which he contributed. In the November 1995 issue of *Life Advocate,* he wrote: "The fact that 3% of the population believes that lethal action against abortionists is justifiable ... probably 'instills fear' enough to make life-preserving decisions.... The fear of the sniper can influence him to consider the end of his life and the judgment to come." (Ex. 88)

152. Defendant Bray uses intimidation as a means of interfering with the provision of reproductive health services.

153. Defendant Bray has never disassociated himself with, nor expressed disapproval of, any of ACLA's activities.

154. Defendant Michael Bray violated or conspired to violate FACE. (Verdict at 5)

155. Defendant Bray injured plaintiffs in the amount of compensatory damages awarded by the jury. (Verdict at 5)

156. Defendant Bray acted with malice, in reckless disregard of plaintiffs' rights and with specific intent in threatening plaintiffs.

D. *Andrew Burnett*

157. Defendant Burnett is the executive director of defendant ALM. (Tr. 865)

158. Defendant Burnett is a co-founder of ACLA. (ACLA Answer ¶ 20a; Tr. 794–95, 827, 1247–48)

159. Defendant Burnett is a regional director of ACLA. (ACLA Answer ¶ 20a; Tr. 863, 1247–48)

160. Defendant Burnett, together with defendant Joseph Foreman, while in Portland, Oregon, drafted a letter announcing the formation ACLA and circulated it on ACLA letterhead. (Tr. 833)

161. Defendant Burnett signed Paul Hill's justifiable homicide petition calling for the acquittal of Shelley Shannon. (Ex. 52)

162. Defendant Burnett signed Paul Hill's justifiable homicide petition calling for the acquittal of Michael Griffin. (Exs. 41A, B, C, D)

163. Defendant Burnett signed the justifiable homicide petition calling for the acquittal of Paul Hill. (Ex. 61)

164. Defendant Burnett is the publisher of *Life Advocate* magazine, *A Time To Kill,* by Michael Bray, and *In Defense of Others,* by Catherine Ramey. (ACLA Answer ¶ 20c; Tr. 793, 937, 1071, 1248)

165. Defendant Burnett has protested at both the home and offices of Dr. Elizabeth Newhall and Dr. James Newhall. (Tr. 892)

166. In June 1998, defendant Burnett violated an injunction ordering him to stay away from Downtown Women's Health Center, the clinic where plaintiffs Dr. Elizabeth Newhall and Dr. James Newhall perform abortions. Defendant Burnett was caught on camera in the hallway outside the Newhalls' office. (Ex. 37, 323; Tr. 856–61)

167. Prior to the entry of that injunction, during a protest outside of the Downtown Women's Center, Burnett attempted to grab the ankles and trip Jane White, co-owner and co-director of Downtown Women's Center. At the time, Ms. White was seven months pregnant. (Tr. 1182, 1185–86)

168. Defendant Burnett attended the event sponsored by defendant Treshman in Oklahoma City in June 1993, at which Burnett and Bray spoke in favor of the use of force. (Ex. 320, Tr. 894)

169. Defendant Burnett attended a meeting in Melbourne, Florida in October 1993 at which the use of force was discussed among the defendants. (Tr. 1471–72)

170. Defendant Burnett attended the meeting in Chicago in April 1994 out of which ACLA was formed. (Tr. 1169)

171. Defendant Burnett attended a planning meeting for the formation of ACLA in the summer of 1994 in St. Louis with defendants Dreste and Foreman. (Tr. 1170)

172. Defendant Burnett attended ACLA's first official event in Jackson, Mississippi in August 1994. (ACLA Answer ¶ 70; Tr. 970, 1254)

173. Defendant Burnett attended the ACLA planning meeting where the Deadly Dozen poster was discussed, in Bowie, Maryland in November 1994. (Tr. 1070)

174. Defendant Burnett participated in an ACLA conference call prior to the January 1995 meeting, to plan the Deadly Dozen poster. (Tr. 2028)

175. Defendant Burnett had multiple telephone discussions with other defendants during the time surrounding ACLA's January 1995 event, at which the Deadly Dozen poster was unveiled. (Ex. 94)

176. Defendant Burnett provided the names and addresses of Drs. Elizabeth and James Newhall and Dr. George Kabacy for the Deadly Dozen poster and helped prepare the poster. (Tr. 956)

177. Defendant Burnett also asked Paul deParrie to provide names for the list. (Tr. 2854)

178. Defendant Burnett attended the ACLA event in Washington, D.C. in January 1995 at which the Deadly Dozen poster was released. (ACLA Answer ¶ 40b; Tr. 1254, 1646)

179. On the day of the release of the Deadly Dozen poster, defendant Burnett publicly stated, referring to Paul Hill: "Looking objectively, I can't say what he did was wrong. I can't say he stepped outside the bounds of protection that I hope I would get if I were in danger of being killed." (ACLA Answer ¶ 42b; Tr. 1255)

180. Defendant Burnett attended a meeting in St. Louis with defendants Crane and Dreste in the summer of 1995 to plan the August 1995 ACLA event in St. Louis. (Tr. 899, 968)

181. Defendant Burnett attended the ACLA event in St. Louis in August 1995 at which the Poster of Dr. Robert Crist was released. (ACLA Answer ¶ 47c; Ex. 409; Tr. 898)

182. Defendant Burnett attended the ACLA event in Washington, D.C. in January 1996 at which the Nuremberg Files were unveiled. (Tr. 970) Burnett was once in possession of hard copy Nuremberg Files, including one of plaintiff James Newhall. (Ex. 9) Burnett did not produce any of these documents during the course of this litigation although required by plaintiffs' document requests and this Court's discovery orders.

183. Defendant Burnett attended the 1996 White Rose Banquet. (Tr. 1496)

184. Defendant Burnett attended the ACLA event in Washington, D.C. in January 1997. (Tr. 1176)

185. Defendant Burnett understands the danger that "Wanted" or "Guilty" posters pose to the lives of those who provide abortions. He testified in this regard, "I mean, if I was an abortionist, I would be afraid." (Tr. 964)

186. Defendant Burnett himself has been tempted to act violently. He said, "I would have to say that anybody who's involved in pro-life activism has been, you know, confronted with that possibility." (Ex. 108)

187. Defendant Burnett uses intimidation as a means of interfering with the provision of reproductive health services.

188. Defendant Burnett has never disassociated himself with, nor expressed disapproval of, any of ACLA's activities.

189. Defendant Andrew Burnett violated or conspired to violate FACE. (Verdict at 6)

190. Defendant Burnett violated or conspired to violate RICO. (Verdict at 6)

191. Defendant Burnett injured each plaintiff in the amount of compensatory damages awarded by the jury. (Verdict at 6)

192. Defendant Burnett acted with malice, in reckless disregard of plaintiffs' rights and with specific intent in threatening plaintiffs.

### E. *David Crane*

193. Defendant Crane is the national director of ACLA. (ACLA Answer ¶ 21a; Tr. 1250–51, 1268)

194. Defendant Crane attended the meeting in Chicago in April 1994 out of which ACLA was formed. (Tr. 1326)

195. Defendant Crane allied himself with Paul Hill at the Chicago meeting and endorsed the use of deadly force. (Tr. 1326)

196. Defendant Crane signed Paul Hill's justifiable homicide petition calling for the acquittal of Michael Griffin. (Ex. 41C)

197. Defendant Crane signed the justifiable homicide petition calling for the acquittal of Paul Hill. (Ex. 61)

198. Defendant Crane was involved in the formation of ACLA. (Tr. 834)

199. Defendant Crane attended ACLA's first official event in Jackson, Mississippi in August 1994. (ACLA Answer ¶ 70; Tr. 1254)

200. Defendant Crane attended the ACLA organizational meeting in Bowie, Maryland in November 1994, to plan the January 1995 event. (Tr. 2008, 2029)

201. Defendant Crane participated in the ACLA conference call to plan the Deadly Dozen poster. (Tr. 2028)

202. Defendant Crane had multiple telephone discussions with other defendants during the time surrounding ACLA's January 1995 event, at which the Deadly Dozen poster was unveiled. (Ex. 94)

203. Defendant Crane prepared the Deadly Dozen poster and solicited names and other information for the poster from other defendants. (Tr. 1385)

204. Defendant Crane unveiled the Deadly Dozen poster at the ACLA event in January 1995 in blown-up form. (Tr. 1352, 1357)

205. Defendant Crane and ACLA republished the Deadly Dozen poster on several occasions after learning that the physicians on the list had been provided U.S. Marshal protection after the poster was published. (Tr. 1445–46)

206. Defendant Crane attended and spoke at the ACLA event in Wichita, Kansas in April 1995. (Tr. 1299–1300)

207. Defendant Crane attended a meeting in St. Louis in the summer of 1995 to plan the August ACLA event in St. Louis. (Tr. 1299)

208. Defendant Crane distributed a letter inviting people to attend the St. Louis ACLA event. (Tr. 1308)

209. Defendant Crane organized and attended the ACLA event in St. Louis in August 1995 at which the Poster of Dr. Robert Crist was released. (ACLA Answer ¶ 47c; Ex. 409; Tr. 1257, 1303)

210. Defendant Crane assisted in the preparation of the Poster of Dr. Robert Crist. (Tr. 1303, 1312)

211. Defendant Crane had multiple telephone discussions with other defendants during the time surrounding ACLA's January 1996 event, at which the Nuremberg Files were unveiled. (Ex. 94)

212. Defendant Crane presented the Nuremberg Files at an ACLA event in January 1996. (Tr. 1361)

213. Defendant Crane met with defendant Charles Wysong and with Paul deParrie and Neal Horsley to plan the Nuremberg Files Internet project. (Tr. 2682)

214. Defendant Crane attended the 1996 White Rose Banquet. (Tr. 1175, 1376)

215. Defendant Crane organized and attended the ACLA event in Washington, D.C. in January 1997. (Tr. 1176)

216. Defendant Crane attended the 1997 White Rose Banquet. (Tr. 1176; 1363–64)

217. Defendant Crane had multiple telephone discussions with other defen-

dants during the time surrounding ACLA's January 1997 event. (Ex. 94)

218. Defendant Crane had created "Wanted" or "Guilty"—style posters prior to the Deadly Dozen poster, including a poster of Dr. Abraham Anderson. After that poster, Dr. Anderson stopped performing abortions because he feared for his personal security and that of his family. (Tr. 1288–89)

219. Defendant Crane admits that there is no difference in impact between posters headed "Wanted" and those headed "Guilty." (Tr. 1352)

220. Defendant Crane once was the subject of a "Wanted" poster of himself and Paul Hill. Crane kept this Wanted poster in his "death threat" file. (Ex. 21; Tr. 1320)

221. Defendant Crane uses intimidation as a means of interfering with the provision of reproductive health services.

222. Defendant Crane has never disassociated himself with, nor expressed disapproval of, any of ACLA's activities.

223. Defendant David Crane violated or conspired to violate FACE. (Verdict at 7)

224. Defendant Crane violated or conspired to violate RICO. (Verdict at 7)

225. Defendant Crane injured each plaintiff in the amount found in compensatory damages by the jury. (Verdict at 7)

226. Defendant Crane acted with malice, in reckless disregard of plaintiffs' rights and with specific intent in threatening plaintiffs.

F. *Michael Dodds*

227. Defendant Dodds is a regional director of ACLA. (ACLA Answer ¶ 23a; Tr. 1251, 1946)

228. Defendant Dodds attended the ACLA meeting in Bowie, Maryland in November 1994, to plan the January 1995 event. (Tr. 1945)

229. Defendant Dodds participated in the ACLA conference call to plan the Deadly Dozen poster. (Tr. 1820)

230. Defendant Dodds attended the ACLA event in Washington, D.C. in January 1995 at which the Deadly Dozen poster was released. (Tr. 1947)

231. Defendant Dodds provided Dr. George Tiller's name for the Deadly Dozen poster. (Tr. 1493)

232. Defendant Dodds endorsed Shelley Shannon's 1993 shooting of Dr. Tiller. Dodds signed a petition calling for her acquittal and solicited donations for Shannon's legal defense fund. (Ex. 52; Tr. 1491)

233. Defendant Dodds signed Paul Hill's justifiable homicide petition calling for the acquittal of Michael Griffin. (Exs. 41B, 41C, 41D)

234. Defendant Dodds had multiple telephone discussions with other defendants during the time surrounding ACLA's April 1995 event in Wichita, Kansas. (Ex. 94)

235. Defendant Dodds hosted and spoke about "New Aggressive Boycott Methods" at the ACLA event in Wichita, Kansas in April 1995. (Tr. 1965, 2044–5)

236. Defendant Dodds excluded the media from that part of the Wichita ACLA event because "we basically want to rely on ... a lack of awareness on the individual's part ... [t]hey are vulnerable in this area so we can gain information." (Ex. 110; Tr. 2044–46)

237. The Nuremberg Files were discussed at the ACLA Witchita event. (Tr. 2082)

238. Defendant Dodds ratified the release of the Poster of Dr. Robert Crist. (Tr. 1494–95)

239. Defendant Dodds attended a planning meeting of ACLA in Bowie, Maryland in November 1995. (Tr. 2032)

240. Defendant Dodds participated in an ACLA conference call in late 1995, to plan the January 1996 event. (Tr. 1495)

241. Defendant Dodds had multiple telephone discussions with other defen-

dants during the time surrounding ACLA's January 1996 event, at which the Nuremberg Files were unveiled. (Ex. 94)

242. Defendant Dodds attended the ACLA event in Washington, D.C. in January 1996 at which the Nuremberg Files were unveiled. (Tr. 2053)

243. Defendant Dodds attended the 1996 White Rose Banquet wearing a badge reading "Lieutenant Colonel AOG." AOG stands for Army of God, the militant anti-abortion group that published a tract on making lethal weapons for the fight against abortion. (Tr. 2074)

244. Defendant Dodds uses intimidation as a means of interfering with the provision of reproductive health services.

245. Defendant Dodds has never disassociated himself with, nor expressed disapproval of, any of ACLA's activities.

246. Defendant Michael Dodds violated or conspired to violate FACE. (Verdict at 8)

247. Defendant Dodds violated or conspired to violate RICO. (Verdict at 8)

248. Defendant Dodds injured each plaintiff in the amount of compensatory damages awarded by the jury. (Verdict at 8)

249. Defendant Dodds acted with malice, in reckless disregard of plaintiffs' rights and with specific intent in threatening plaintiffs.

G. *Timothy Paul Dreste*

250. Defendant Dreste is a regional director of ACLA. (ACLA Answer ¶ 22a; Tr. 864, 1251, 1270)

251. Defendant Dreste attended the meeting in Chicago in April 1994 out of which ACLA was formed. (Tr. 1169)

252. At or around the time of that meeting, Dreste and defendants Foreman and Burnett met with approximately 100–120 others and discussed forming a new organization which became ACLA. (Tr. 1169)

253. Defendant Dreste attended the planning meeting for the formation of ACLA in the summer of 1994 with defendants Foreman and Burnett. (Tr. 1170)

254. Defendant Dreste contributed money to Paul Hill's support fund. (Tr. 1169)

255. Defendant Dreste approved of the Deadly Dozen poster. Dreste regretted that Dr. Robert Crist was not one of the doctors named on the poster. (Tr. 1170)

256. Defendant Dreste attended the meeting in the summer of 1995 to plan the August 1995 ACLA event in St. Louis. (Tr. 899)

257. Defendant Dreste emceed the ACLA event in St. Louis in August 1995 at which the Poster of Dr. Robert Crist was released. (Tr. 1173)

258. Defendant Dreste continues to circulate the Poster of Dr. Robert Crist. (Tr. 1173; ¶ 482 *infra*)

259. Defendant Dreste also was involved in the creation and publication at the August 1995 ACLA event of a poster of Reproductive Health Services, the clinic where Dr. Crist works, and posters of Dr. John Stopple, Dr. Yogendra Shah and the clinics where those doctors performed abortions. (Exs. 6, 18, 19; Tr. 1173)

260. Defendant Dreste had multiple telephone discussions with other defendants during the time surrounding ACLA's January 1996 event, at which the Nuremberg Files were unveiled. (Ex. 94)

261. Defendant Dreste attended the ACLA event in Washington, D.C. in January 1996 at which the Nuremberg Files were unveiled. (Tr. 1175)

262. At that event, defendant Dreste received a $500 simulated check for getting Dr. John Stopple to stop performing abortions just months after ACLA put Dr. Stopple on a poster nearly identical to the Poster of Dr. Crist. (Ex. 18; Tr. 2679–80, 2701–02) The poster was unveiled at the same August 1995 ACLA event at which the Poster of Dr. Crist was unveiled. That fake check was presented by defendant Crane. (Tr. 2703)

263. Defendant Dreste attended the ACLA event in Washington, D.C. in January 1997. (Tr. 1175)

264. Defendant Dreste attended the 1996 and 1997 White Rose Banquets. (Tr. 1175–76)

265. When defendant Dreste protests outside St. Louis abortion clinics, he often wears a hat adorned with shotgun shells. (Tr. 1176)

266. One week after the murder of Dr. Gunn, Dreste stood outside of a St. Louis abortion clinic where Dr. Yogendra Shah performed abortions and held up a sign "Dr. Shah, do you feel under the Gunn?" (Ex. 149)

267. Defendant Dreste uses intimidation as a means of interfering with the provision of reproductive health services.

268. Defendant Dreste has never disassociated himself with, nor expressed disapproval of, any of ACLA's activities.

269. Defendant Timothy Dreste violated or conspired to violate FACE. (Verdict at 9)

270. Defendant Dreste violated or conspired to violate RICO. (Verdict at 9)

271. Defendant Dreste injured each plaintiff in the amount of compensatory damages awarded by the jury. (Verdict at 9)

272. Defendant Dreste acted with malice, in reckless disregard of plaintiffs' rights and with specific intent in threatening plaintiffs.

H. *Joseph Foreman*

273. Defendant Foreman is a co-founder of ACLA. (ACLA Answer ¶ 24a; Tr. 1251, 2193)

274. Defendant Foreman helped draft and signed Paul Hill's justifiable homicide petition calling for the acquittal of Michael Griffin. (Ex. 41A; Tr. 2208)

275. Defendant Foreman attended a meeting in Melbourne, Florida in October 1993 at which the use of force was discussed among defendants. (Tr. 1471–72)

276. Defendant Foreman organized the meeting in Chicago in April 1994 out of which ACLA was formed. (Tr. 2126)

277. Defendant Foreman sent a letter to approximately 500 people announcing the formation of ACLA and encouraging participation. (Tr. 2193)

278. Defendant Foreman drafted the ACLA constitution. (Tr. 2202–03)

279. Defendant Foreman attended a planning meeting for the formation of ACLA in the summer of 1994. (Tr. 2198–2201)

280. Defendant Foreman planned and attended ACLA's first official event in Jackson, Mississippi in August 1994. (Tr. 2134–37)

281. Defendant Foreman attended the ACLA organizational meeting in Bowie, Maryland in November 1994. (Tr. 2029)

282. Defendant Foreman attended the ACLA event in Washington, D.C. in January 1995 at which the Deadly Dozen poster was released. (ACLA Answer ¶ 40b; Tr. 1254)

283. Defendant Foreman attended and spoke at the ACLA event in Wichita, Kansas in April 1995 where Nuremberg Files were discussed. (Tr. 1301, 1494, 2140)

284. Defendant Foreman had multiple telephone discussions with other defendants during the time surrounding ACLA's January 1996 event, at which the Nuremberg Files were unveiled. (Ex. 94)

285. Defendant Foreman has been found by a federal judge to have "bumped, shoved, and slashed or pushed Dr. Morris"; "Dr. Morris sustained some cuts and scratches. The incident also caused both Dr. and Mrs. Morris to suffer mental anguish and stress." Dr. Morris is a doctor in California who performs abortions. (Ex. 474; Tr. 2184)

286. Defendant Foreman uses intimidation as a means of interfering with the provision of reproductive health services.

287. Defendant Foreman has never disassociated himself with, nor expressed disapproval of, any of ACLA's activities.

288. Defendant Joseph Foreman violated or conspired to violate FACE. (Verdict at 10)

289. Defendant Foreman violated or conspired to violate RICO. (Verdict at 10)

290. Defendant Foreman injured each plaintiff in the amount of compensatory damages awarded by the jury. (Verdict at 10)

291. Defendant Foreman acted with malice, in reckless disregard of plaintiffs' rights and with specific intent in threatening plaintiffs.

### I.  *Charles Roy McMillan*

292. Defendant McMillan is a co-founder and prominent member of ACLA. (ACLA Answer ¶ 25a; Tr. 125[2])

293. Defendant McMillan, in *Life Advocate* magazine and elsewhere, lied about having served as an infantry officer in Vietnam. In the article entitled, "Two Killers in this House, and We Sleep Fine, Thank You," McMillan asserted that he had killed hundreds of his "enemies" in Vietnam. (Tr. 1228) McMillan made these statements to intimidate abortion providers.

294. Defendant McMillan attended a meeting in Melbourne, Florida in October 1993 at which the use of force was discussed among defendants. (Tr. 1471–72)

295. Defendant McMillan attended a dinner at Paul Hill's house on the eve of Michael Griffin's trial for the murder of Dr. Gunn. Defendants Bray, Burnett and Crane were there as well. All agreed that the murder of Dr. Gunn was "justifiable homicide." (Tr. 1221)

296. Defendant McMillan signed Paul Hill's petition calling for the acquittal of Shelley Shannon. (Ex. 52)

297. Defendant McMillan signed Paul Hill's justifiable homicide petition calling for the acquittal of Michael Griffin. (Exs. 41A, B, C, D; Tr. 1222)

298. Defendant McMillan signed the justifiable homicide petition calling for the acquittal of Paul Hill. (Ex. 61)

299. McMillan has publicly stated that it is justifiable and righteous not only to kill physicians who provide abortions, but also anyone else who is involved in the provision of abortion or supports abortion rights. (Tr. 1225)

300. Defendant McMillan attended the meeting in Chicago in April 1994 out of which ACLA was formed. (Tr. 1472)

301. Defendant McMillan hosted ACLA's first official event in Jackson, Mississippi in August 1994, where Dr. Joseph Booker was targeted. (Tr. 971, 2203)

302. Defendant McMillan had multiple telephone discussions with other defendants during the time surrounding ACLA's January 1995 event, at which the Deadly Dozen poster was unveiled. (Ex. 94)

303. Defendant McMillan attended the ACLA event in Washington, D.C. in January 1995 at which the Deadly Dozen poster was released. (ACLA Answer ¶ 40b; Tr. 1254)

304. Defendant McMillan provided the name of Dr. Joseph Booker to David Crane for the Deadly Dozen poster. (Tr. 1228)

305. Defendant McMillan attended the ACLA event in St. Louis in August 1995 at which the Poster of Dr. Robert Crist was released. (ACLA Answer ¶ 47c; Tr. 1257)

306. Defendant McMillan invoked the Fifth Amendment when asked if he had ever damaged an abortion clinic. (Tr. 1228–29)

307. Defendant McMillan advocates and promotes violence against abortion providers and abortion clinic workers. He has stated "those employees choose to work in a place where human beings are being killed. They choose to enter the killing zone and they need to understand and be warned that people who choose to kill and be accessories to murder may very well have violence done against them to

stop the violence they are perpetrating on human beings in the womb." (Answer ¶ 79; Tr. 1255)

308. Defendant McMillan praised the bombing of a Birmingham, Alabama abortion clinic where a police officer was killed and a nurse was critically injured, declaring, "I think it was a righteous act." (Ex. 114)

309. Defendant McMillan, in discussing the antiabortion movement, stated "more violence is inevitable and it is righteous. It wouldn't bother me if every abortionist in the country today fell dead from a bullet." (ACLA Answer ¶ 45a; Tr. 1224, 1256)

310. Defendant McMillan believes violence is justified. He believes in "killing people in just wars, and there is a war in the womb." (Tr. 1225)

311. Defendant McMillan, three months after the murder of Dr. Britton, called Paul Hill "a patriot," and a "wonderful man" who had "fired the first shots in this war." (Tr. 791)

312. Defendant McMillan believes it is acceptable to shoot a pregnant abortion provider because "if you have to sacrifice an innocent to save many, it would be alright." (Tr. 1225)

313. Defendant McMillan believes it would be justifiable to kill the President and the Justices on the U.S. Supreme Court who support abortion rights. (Tr. 1225)

314. Defendant McMillan uses intimidation as a means of interfering with the provision of reproductive health services.

315. Defendant McMillan has never disassociated himself with, nor expressed disapproval of, any of ACLA's activities.

316. Defendant Charles Roy McMillan violated or conspired to violate FACE. (Verdict at 11)

317. Defendant McMillan violated or conspired to violate RICO. (Verdict at 11)

318. Defendant McMillan injured each plaintiff in the amount of compensatory damages awarded by the jury. (Verdict at 11)

319. Defendant McMillan acted with malice, in reckless disregard of plaintiffs' rights and with specific intent in threatening plaintiffs.

### J. Bruce Murch

320. Defendant Murch is a regional director of ACLA. (ACLA Answer ¶ 27a; Tr. 1252, 2641)

321. Defendant Murch saved in his files a document that states "abortion clinics should be destroyed." (Ex. 454)

322. Defendant Murch has stated that the murder of Dr. Gunn was justifiable homicide. (Tr. 2716)

323. Defendant Murch attended the meeting in Chicago in April 1994 out of which ACLA was formed. (Tr. 2576)

324. Defendant Murch had multiple telephone discussions with other defendants during the time surrounding ACLA's January 1995 event, at which the Deadly Dozen poster was unveiled. (Ex. 94)

325. Defendant Murch attended and spoke at the ACLA event in Washington, D.C. in January 1995 at which the Deadly Dozen poster was released. (ACLA Answer ¶ 40b; Tr. 1254, 2592)

326. Defendant Murch provided the names and addresses of the two doctors from the Northeast region for the Deadly Dozen poster. (Tr. 2592)

327. Defendant Murch republished the Deadly Dozen poster in his newsletter *Salt & Light* after being made aware that physicians on this poster had been provided U.S. Marshal protection. He circulated his newsletter with the Deadly Dozen poster to 700 people. (Ex. 2; Tr. 2625)

328. Defendant Murch attended the meeting in St. Louis in the summer of 1995 to plan the ACLA event in St. Louis in August 1995. (Tr. 1171)

329. Defendant Murch ratified the release of the Poster of Dr. Robert Crist. (Tr. 2644)

330. Defendant Murch attended the ACLA planning meeting in Bowie, Maryland in November 1995. (Tr. 2586)

331. Defendant Murch printed the 1996 White Rose calendar. (Ex. 83; Tr. 2607)

332. Defendant Murch also printed Michael Bray's newsletter, *Capitol Area Christian News.*

333. Defendant Murch planned to attend the January 1996 ACLA event where the Nuremberg Files were unveiled, but at the last minute was unable to attend. (Tr. 2604–05)

334. Defendant Murch compared himself and ACLA to the militant wing of the black power movement that advocated "violent overthrow by blacks," in contrast to the pacifist wing of the civil rights movement led by Dr. Martin Luther King, Jr. (Tr. 2632)

335. Defendant Murch believes that there is a difference between the use of force and violence. He considers the use of "force" legitimate. (Tr. 2365–66)

336. Defendant Murch uses intimidation as a means of interfering with the provision of reproductive health services.

337. Defendant Murch has never disassociated himself with, nor expressed disapproval of, any of ACLA's activities.

338. Defendant Bruce Murch violated or conspired to violate FACE. (Verdict at 12)

339. Defendant Murch violated or conspired to violate RICO. (Verdict at 12)

340. Defendant Murch injured each plaintiff in the amount of compensatory damages awarded by the jury.

341. Defendant Murch acted with malice, in reckless disregard of plaintiffs' rights and with specific intent in threatening plaintiffs.

### K. Catherine Ramey

342. Defendant Ramey is the associate director of defendant ALM and the associate editor of *Life Advocate* magazine. (ACLA Answer ¶¶ 29a, 29c; Tr. 1252, 2470)

343. Defendant Ramey edited Paul Hill's article in *Life Advocate* entitled "Who Killed the Innocent, Michael Griffin or David Gunn?" Ramey titled the final section of the article, "A Call to Specific Action," referring to killing abortion providers. (Ex. 320; Tr. 2501–02) The Paul Hill article was published the month before Shelley Shannon shot Dr. Tiller. (Tr. 2502)

344. Defendant Ramey wrote *In Defense of Others.*

345. Defendant Ramey edited defendant Bray's book, *A Time to Kill.*

346. Former ALM subscribers who read defendant Ramey's articles in *Life Advocate* concluded that she was advocating violence and perhaps was potentially violent herself. (Ex. 66)

347. Defendant Ramey signed Paul Hill's justifiable homicide petition calling for the acquittal of Michael Griffin. (Exs. 41A, B, C, D; Tr. 2503–04)

348. Defendant Ramey signed the justifiable homicide petition calling for the acquittal of Paul Hill. (Ex. 61; Tr. 2484)

349. Defendant Ramey is aware that certain people in the pro-life movement believe that Paul Hill and Michael Griffin should be executed for what they did. She has stated that that position is shameful. (Tr. 1088)

350. Defendant Ramey attended the Chicago meeting in April 1994 out of which ACLA was formed. (Tr. 1472)

351. Defendant Ramey attended the ACLA event in Washington, D.C. in January 1995 at which the Deadly Dozen poster was released. (Cite)

352. Defendant Ramey attended the ACLA event in St. Louis in August 1995 at which the Poster of Dr. Robert Crist was released. (ACLA Answer ¶ 47c; Tr. 899, 1257)

353. Ramey has promoted ACLA's message. (ACLA Answer ¶ 29g)

354. Defendant Ramey was in possession of the hard copy Nuremberg Files when they were maintained at ALM's offices during the course of this lawsuit, prior to their destruction. (Ex. 9)

355. Defendant Ramey, associate director of ALM, destroyed ALM documents and deleted material from ALM's computers since this litigation commenced and plaintiffs served requests for the production of documents on both ALM and Ramey. (Tr. 2513–14)

356. Defendant Ramey put on her car a bumper sticker that reads "EXECUTE Murderers/Abortionists" in the hope that her "car will exude a sense of justice that will cause a killer to question his security, temporal and eternal." (Ex. 379)

357. Defendant Ramey has stated that it is a good thing when abortion providers are shot. She declared "I would not hold out a Kleenex where an abortion provider shot. I—I think that there is an element of justice that is undeniable, and whether we recognize that legally or not . . . there is an element of justice." (Tr. 2505–06)

358. Defendant Ramey uses intimidation as a means of interfering with the provision of reproductive health services.

359. Defendant Ramey has never disassociated herself with, nor expressed disapproval of, any of ACLA's activities.

360. Defendant Catherine Ramey violated or conspired to violate FACE. (Verdict at 13)

361. Defendant Ramey violated or conspired to violate RICO. (Verdict at 13)

362. Defendant Ramey injured each plaintiff in the amount of compensatory damages awarded by the jury. (Verdict at 13)

363. Defendant Ramey acted with malice, in reckless disregard of plaintiffs' rights and with specific intent in threatening plaintiffs.

### L. Dawn Stover

364. Defendant Stover is the associate director of ALM. (ACLA Answer ¶ 30a; Tr. 1253, 2427)

365. Defendant Stover is an active participant in the activities of the Northwest Region of ACLA. (ACLA Answer ¶ 30a; Tr. 1253)

366. Defendant Stover attended a meeting in Melbourne, Florida in October 1993 at which the use of force was discussed among defendants. (Tr. 1471–2)

367. Defendant Stover attended the Chicago meeting in April 1994 out of which ACLA was formed. (Tr. 2451)

368. Defendant Stover attended the ACLA planning meeting in Bowie, Maryland in November 1994. (Tr. 1492–93)

369. Defendant Stover attended and was the media spokesperson for ACLA at the ACLA event in Washington, D.C. in January 1995 at which the Deadly Dozen poster was released. (ACLA Answer ¶ 40b; Tr. 1254, 2431)

370. Defendant Stover attended the ACLA event in St. Louis in August 1995 at which the Poster of Dr. Robert Crist was released. (Tr. 2443)

371. Defendant Stover signed Paul Hill's justifiable homicide petition calling for the acquittal of Michael Griffin. (Ex. 41D)

372. Defendant Stover signed the justifiable homicide petition calling for the acquittal of Paul Hill. (Ex. 61)

373. Defendant Stover's parents-in-law, former subscribers to Life Advocate, concluded that ALM's staff, which includes Stover, supports murder of abortion providers. (Ex. 68)

374. Defendant Stover, after Shelley Shannon shot Dr. Tiller and Michael Griffin murdered Dr. Gunn, appeared with Paul Hill on ABC's Nightline. Stover stated: "I do believe that if her [Shelley Shannon's] intent was to save the children that George Tiller was going to kill that

day, then Shelley, in my eyes, is a heroine." (Tr. 2455–56)

375. Defendant Stover uses intimidation as a means of interfering with the provision of reproductive health services.

376. Defendant Stover has never disassociated herself with, nor expressed disapproval of, any of ACLA's activities.

377. Defendant Dawn Stover violated or conspired to violate FACE. (Verdict at 14)

378. Defendant Stover violated or conspired to violate RICO. (Verdict at 14)

379. Defendant Stover injured each plaintiff in the amount of compensatory damages awarded by the jury. (Verdict at 14)

380. Defendant Stover acted with malice, in reckless disregard of plaintiffs' rights and with specific intent in threatening plaintiffs.

M. *Donald Treshman*

381. Defendant Treshman is a regional director of ACLA. (ACLA Answer ¶ 31a; Tr. 1253, 1496)

382. In May 1993, when defendant Treshman learned that Dr. Robert Crist planned to practice medicine regularly at a Planned Parenthood clinic in Kansas City, Missouri, Treshman stated "we have been assured that he [Dr. Crist] will be monitored and that appropriate action will be taken." (ACLA Answer ¶ 59; Tr. 1260)

383. Defendant Treshman organized and sponsored an event in Oklahoma City in June 1993 at which Michael Bray and Andrew Burnett spoke in favor of the use of force. (Ex. 320; Tr. 894)

384. Defendant Treshman knew that before Dr. Gunn's murder in 1993, a wanted poster of Dr. Gunn had been circulated in Pensacola, Florida where Dr. Gunn lived and worked. (Tr. 1497)

385. On the morning of Dr. Gunn's murder, defendant Treshman issued a press release endorsing the murder and calling for donations for Michael Griffin's defense. (Ex. 40)

386. Defendant Treshman attended the meeting in Chicago in April 1994 out of which ACLA was formed. (Tr. 1472)

387. Defendant Treshman assisted in the formation of ACLA. (Tr. 834)

388. Defendant Treshman provided the name of Dr. Douglas Karpen for the Deadly Dozen poster. (Tr. 1493)

389. Defendant Treshman attended the ACLA event in Washington, D.C. in January 1995 at which the Deadly Dozen poster was released. (ACLA Answer ¶ 40b; Tr. 1254, 1493)

390. Treshman's *Newsline* announced in January 1995 that immediately after release of the Deadly Dozen poster, the physicians on the poster were offered U.S. Marshal protection. (Ex. 71)

391. Defendant Treshman was a featured speaker at ACLA events. (Tr. 1300)

392. Defendant Treshman had multiple telephone discussions with other defendants during the time surrounding ACLA's August 1995 event, at which the Dr. Crist poster was unveiled. (Ex. 94)

393. Defendant Treshman received a letter from David Crane regarding the St. Louis event in August 1995 and the Poster of Dr. Robert Crist. (Ex. 76)

394. Defendant Treshman attended the ACLA planning meeting in November 1995. (Tr. 2645)

395. Defendant Treshman had multiple telephone discussions with other defendants during the time surrounding ACLA's January 1996 event, at which the Nuremberg Files were unveiled. (Ex. 94)

396. Defendant Treshman advocates and promotes the use of force. In reference to the sniper shooting of abortion provider Dr. Garson Romalis in Canada in November 1994, Treshman stated "I would say that was certainly the superb tactic. It was certainly far better than anything that was seen in the States. Because the shooting was done in such a way that the perpetrator got away. I would think more

abortionists would quit as a result of it." (Ex. 113)

397. Defendant Treshman uses intimidation as a means of interfering with the provision of reproductive health services.

398. Defendant Treshman has never disassociated himself with, nor expressed disapproval of, any of ACLA's activities.

399. Defendant Donald Treshman violated or conspired to violate FACE. (Verdict at 15)

400. Defendant Treshman injured each plaintiff in the amount of compensatory damages awarded by the jury. (Verdict at 15)

401. Defendant Treshman acted with malice, in reckless disregard of plaintiffs' rights and with specific intent in threatening plaintiffs.

### N. *Charles Wysong*

402. Defendant Wysong is a regional director of ACLA. (ACLA Answer ¶ 32a; Tr. 1253, 2671)

403. Defendant Wysong attended the ACLA event in Washington, D.C. in January 1995 at which the Deadly Dozen poster was released. (Tr. 1493–94)

404. Defendant Wysong provided defendant Crane with names of physicians for the Deadly Dozen poster. (Tr. 2671)

405. Defendant Wysong attended and spoke at the ACLA event in Wichita, Kansas in April 1995. (Tr. 2044, 2672)

406. Defendant Wysong attended the meeting in St. Louis in the summer of 1995 to plan the August 1995 ACLA event in St. Louis. (Tr. 968)

407. Defendant Wysong attended the ACLA event in St. Louis in August 1995 at which the Poster of Dr. Robert Crist was released. (ACLA Answer ¶ 47c; Ex. 409; Tr. 899, 1257)

408. Defendant Wysong prepared the Poster of Dr. Robert Crist with the assistance of defendants Burnett, Crane and Dreste. (Tr. 2736)

409. Defendant Wysong attended the ACLA planning meeting in Bowie, Maryland in November 1995. (Tr. 2645)

410. Defendant Wysong had multiple telephone discussions with other defendants during the time surrounding ACLA's January 1996 event, at which the Nuremberg Files were unveiled. (Ex. 94)

411. Defendant Wysong attended and spoke at an ACLA event in Washington, D.C. in January 1996 at which the Nuremberg Files were unveiled. (Ex. 79; Tr. 2679)

412. Defendant Wysong attended the 1996 White Rose Banquet. (Tr. 2350)

413. Defendant Wysong met with defendant David Crane, Paul deParrie and Neal Horsley to plan the Nuremberg Files Internet project. (Tr. 2682)

414. Defendant Wysong attended and spoke at the ACLA event in Washington, D.C. in January 1997. (Tr. 1181)

415. Defendant Wysong attended the 1997 White Rose Banquet. (Tr. 1181, 2388)

416. Defendant Wysong was keenly aware of the effect posters such as the Deadly Dozen poster, the Poster of Dr. Robert Crist and the Nuremberg Files would have. He stated: "Listening to what abortionists said, abortionists who have quit the practice who are no longer killing babies but are now pro-life. They said the two things they feared the most were being sued for malpractice and having their picture put on a poster." (Tr. 1178)

417. Defendant Wysong uses intimidation as a means of interfering with the provision of reproductive health services.

418. Defendant Wysong has never disassociated himself with, nor expressed disapproval of, any of ACLA's activities.

419. Defendant Charles Wysong violated or conspired to violate FACE. (Verdict at 16)

420. Defendant Wysong violated or conspired to violate RICO. (Verdict at 16)

421. Defendant Wysong injured each plaintiff in the amount of compensatory damages awarded by the jury. (Verdict at 16)

422. Defendant Wysong acted with malice, in reckless disregard of plaintiffs' rights and with specific intent in threatening plaintiffs.

IV. *Paul deParrie and Neal Horsley are Agents of the Defendants and Participated in the Destruction of Documents*

423. Paul deParrie is an agent of defendants ACLA, ALM and Burnett.

424. Neal Horsley is an agent of defendants ACLA, Michael Bray, Andrew Burnett, David Crane and Charles Wysong.

425. Horsley and deParrie conspired with the defendants in connection with the preparation and publication of the Nuremberg Files.

426. Horsley and deParrie conspired with defendants to obstruct justice by destroying or assisting in concealing the hard copy versions of Nuremberg Files so that they would not be available to plaintiffs or the Court.

427. DeParrie is the editor-in-chief of ALM's *Life Advocate* magazine, published by Andrew Burnett. (Tr. 2791–92) DeParrie selects the news stories and commentaries that run in the magazine each month. (Tr. 2798)

428. DeParrie leads ALM events. (Tr. 2813–14, 2863)

429. DeParrie was once jailed for violating an injunction entered against ALM. (Tr. 2860)

430. DeParrie, at defendant Burnett's request, provided names of doctors for the Deadly Dozen Poster. (Tr. 2854)

431. DeParrie attended the January 1996 and January 1997 ACLA events in Washington D.C. (Tr. 2815–20).

432. DeParrie attended the White Rose Banquets in January 1996 and January 1997. (Tr. 2819–20)

433. DeParrie brought hard copy Nuremberg Files from ALM's offices to the January 1996 ACLA event, at which deParrie was a featured speaker and gave a presentation on the Nuremberg Files along with defendant Crane. (Tr. 2865)

434. DeParrie discussed creating the Nuremberg Files with defendants Burnett, Crane and Wysong. (Tr. 2815, 2819–20, 2682–83)

435. DeParrie, Neal Horsley and defendants Bray, Crane and Wysong conceived of putting the Nuremberg files on the Internet.

436. In 1997, as discovery in this case was proceeding, deParrie provided Neal Horsley's telephone number to David Crane and informed Horsley that Crane would be calling him about removing ACLA's name from the Nuremberg Files. (Tr. 2834)

437. The hard copy version of Dr. James Newhall's Nuremberg Files was broadcast on a television program that showed defendants Burnett and Ramey, along with Paul deParrie, compiling Dr. Newhall's file at defendant ALM's Portland offices. (Ex. 9)

438. Paul deParrie took the photographs of Dr. James Newhall and his home for the Nuremberg Files during an ALM protest outside of Dr. Newhall's home in late 1994. (Tr. 893, 2844)

439. DeParrie did not produce this or any other Nuremberg File (or any other file on abortion providers) in response to a subpoena calling for their production in this case. (Tr. 2875–76)

440. Horsley did not produce this or any other Nuremberg File (or any other file on abortion providers) in response to a subpoena calling for their production in this case. (Tr. 2374)

441. Horsley manages the Nuremberg Files on the Internet as an agent and co-conspirator of defendant. (Tr. 1556)

442. Horsley publishes defendant Bray's *Capitol Area Christian News* on his website. (Tr. 2239)

443. The Nuremberg Files are linked to *Life Advocate* on Horsley's website. (Ex. 8)

444. Horsley has testified inconsistently about whether he attended the 1996 or 1997 White Rose Banquet in order to offer his "services," to defendants. (Tr. 2238, 2335–36)

445. Horsley offered his website services specifically to defendants Crane and Bray. (Tr. 2349)

446. Defendant Bray announced at his White Rose Banquet that Horsley was developing websites. (Tr. 2239)

447. The Internet format for the Nuremberg Files was conceived by Crane, Wysong, deParrie and Horsley. (Tr. 2682–83)

448. Horsley did what he was told with regard to the hard copy and Internet versions of the Nuremberg Files. He stated, "When I work for someone, I do what they tell me to do, and I'm scrupulous in making sure that what I'm doing is in harmony with what they want." (Tr. 2250)

449. Soon after the ACLA event, Horsley received hard copies of the Nuremberg Files to be posted in the Internet. The cover letter with the files Horsley received contained ACLA's name and other text for the Nuremberg Files. (Tr. 2331)

450. Horsley and deParrie conspired to obstruct justice by destroying or assisting in concealing the hard copy versions of Nuremberg Files, in order to assist the defendants in this case.

451. Horsley shipped the hard copy files off to an undisclosed location at the request of deParrie, who did not want them discovered in this or any other litigation. "I think that these things could be seized from people's houses, under various kinds of court orders and stuff, and then it would be gone, and we wouldn't have any recourse ... I don't want to know where it is, and I am just hoping that it will resurface if we ever get the chance to have [Nuremberg] trials." (Tr. 2891–92)

452. In sending the files to this undisclosed location, Horsley understood that "the best thing to do with them was to—to send them somewhere where nobody knew where they were, including me." (Tr. 2309) Horsley remained confused about why he should send away material he had just posted on the Internet, but complied anyway: "I was thinking that I was cooperating with deParrie's idea. Even though I thought it was a little bit dufus, but you know, I am with the program." (Tr. 2312)

453. Horsley claims to have forgotten any information about where he sent the files. "I purposely basically filed it away back there somewhere, you know, because I—the whole idea was that this is something that probably is best not to be remembered." (Tr. 2373) DeParrie denied that he asked Horsley to discard the files, but I find that testimony—as well as the testimony of the other defendants about the location of the Nuremberg Files—to be not credible.

## V. *Adequacy of Remedy*

■ 454. As a result of the defendants' issuance of these threats, plaintiffs have undertaken a variety of security measures in order to ensure their safety.

455. Based upon the evidence admitted at trial, the Court finds that plaintiffs remain threatened by the defendants' threats, and thus have no adequate remedy at law.

## CONCLUSIONS OF LAW

456. From my independent review of the evidence produced at trial, from which I have made the above findings of fact, I conclude that plaintiffs have proven with clear and convincing evidence that each defendant, acting independently and as a co-conspirator, prepared, published and disseminated the Deadly Dozen poster, the

Poster of Dr. Robert Crist and the Nuremberg Files.

457. I find that each defendant acted with specific intent and malice in a blatant and illegal communication of true threats to kill, assault or do bodily harm to each of the plaintiffs and with the specific intent to interfere with or intimidate the plaintiffs from engaging in legal medical practices and procedures. The term "threaten" as used hereafter incorporates this definition.

458. I totally reject the defendants' attempts to justify their actions as an expression of opinion or as a legitimate and lawful exercise of free speech in order to dissuade the plaintiffs from providing abortion services.

459. The Freedom of Access to Clinic Entrances Act ("FACE"), 18 U.S.C. § 248, provides that in an action brought by a "person aggrieved" by threats of force, "the court may award appropriate relief, including temporary, preliminary, permanent injunctive relief and compensatory and punitive damages, as well as costs of suit and reasonable fees for attorneys...." 18 U.S.C. § 248(c)(1)(B). In its verdict, the jury found each defendant liable under FACE and awarded each plaintiff compensatory and punitive damages against each defendant.

460. FACE provides this Court with express statutory authority for injunctive relief, and the substantial evidence of continuing harm to plaintiffs from defendants' unlawful threats provides clear factual and equitable bases for issuance of an injunction. In light of that authority, the general equitable authority of the Court, and the Court's findings concerning the grave threat to each plaintiff's security and the likelihood of continuing harm from each defendant, on February 25, 1999, I issued a permanent injunction enjoining defendants from continuing their unlawful threats that place plaintiffs' lives in peril, and binding the defendants' agents, and those persons in active concert or participation with them. I now enter this amended order and permanent injunction,

nunc pro tunc February 25, 1999. See Fed.R.Civ.P. 65(d).

461. Plaintiffs are entitled to permanent injunctive relief because they lack an adequate remedy at law. See Continental Airlines, Inc. v. Intra Brokers, Inc., 24 F.3d 1099, 1104 (9th Cir.1994). Each day, plaintiffs' lives and security are endangered because of defendants' unlawful threats against them. Monetary relief alone cannot address that harm. This Court has, therefore, the obligation to fashion equitable relief to protect the plaintiffs rights.

462. In deciding whether to grant permanent injunctive relief, the Court considers the balance of hardships or equities-weighing on one hand the harm to plaintiffs if the Court declines to prohibit the defendants' threats, and on the other hand the harm to defendants from an injunction ordering them to cease these activities. See, e.g., Continental Airlines, 24 F.3d at 1105; Laerdal, 73 F.3d at 857. I find that the balance of hardships weighs overwhelmingly in plaintiffs' favor. In the absence of an injunction, plaintiffs will continue to live as they did before the trial: clad in bulletproof vests and disguises, borrowing cars and varying routes to avoid detection, and constantly in fear of the bodily harm with which they have been threatened.

463. By contrast, the prohibition of unlawful activities imposes no burden on defendants. Defendants may protest abortion using legitimate, lawful means.

464. The scope and terms of an injunction are determined by the extent of the underlying violation. See Califano v. Yamasaki, 442 U.S. 682, 702, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979). This Court possesses great discretion in crafting an injunction and may frame it to "bar future violations likely to occur." Transgo, Inc. v. Ajac Transmission Parts Corp., 768 F.2d 1001, 1021–22 (9th Cir.1985) (citation omitted).

465. The law requires a higher level of scrutiny and proof for an injunction involving speech than for an award of damages for violation of a statute. *See Madsen v. Women's Health Center*, 512 U.S. 753, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994). I find the actions of the defendants in preparing, publishing and disseminating these true threats objectively and subjectively[1] were not protected speech under the First Amendment. Therefore, the Court issues the following permanent injunction against each defendant, their agents and those in active concert or participation with them, and specifically against Paul DeParrie, an employee and agent of defendant Advocates for Life Ministries, who conspired with Neal Horsley of Carrollton, Georgia, to provide the specific information for the Nuremberg Files and who thereafter obstructed justice by destroying or assisting in concealing the materials he provided to Horsley to convert into true threats on his web site.

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED AS FOLLOWS:

### PERMANENT INJUNCTION

1. Under the equitable powers of this Court and the Court's authority granted under the Freedom of Access to Clinics Entrances Act ("FACE"), 18 U.S.C. § 248, defendants AMERICAN COALITION OF LIFE ACTIVISTS, ADVOCATES FOR LIFE MINISTRIES, MICHAEL BRAY, ANDREW BURNETT, DAVID CRANE, MICHAEL DODDS, TIMOTHY PAUL DRESTE, JOSEPH L. FOREMAN, CHARLES ROY MCMILLAN, BRUCE EVAN MURCH, CATHERINE RAMEY, DAWN MARIE STOVER, DONALD TRESHMAN and CHARLES WYSONG (collectively "defendants"), and their agents and all persons in active concert or participation with any of them who receive actual notice of this Order and Permanent Injunction or the "Notice" attached as Exhibit A to this Order, are hereby immediately and permanently ENJOINED and RESTRAINED from committing any of the following acts or aiding, abetting, directing or facilitating others to commit or conspiring with any others to commit the following acts:

(a) Threatening, with the specific intent to do so, Dr. Robert Crist, Dr. Warren Hern, Dr. Elizabeth Newhall, Dr. James Newhall, Planned Parenthood of the Columbia/Willamette, Inc., Portland Feminist Women's Health Center, doing business as All Women's Health Services, or any of them, or any of their family members, officers, agents, servants, employees, patients, or attorneys, in violation of the Freedom of Access to Clinics Entrances Act ("FACE"), 18 U.S.C. § 248;

(b) Publishing, republishing, reproducing and/or distributing anywhere, either directly or indirectly, the "Deadly Dozen" Poster, which is Trial Exhibit 1, or its equivalent, with specific intent to threaten Dr. Robert Crist, Dr. Warren Hern, Dr. Elizabeth Newhall, Dr. James Newhall, Planned Parenthood of the Columbia/Willamette, Inc., Portland Feminist Women's Health Center, doing business as All Women's Health Services, or any of them, or any of their family members, officers, agents, servants, employees, patients, or attorneys;

(c) Publishing, republishing, reproducing and/or distributing anywhere, either directly or indirectly, the Poster of Dr. Robert Crist, which is Trial

---

1. For purposes of this Order and Preliminary Injunction, I consider a person to make a "true threat" when the person makes a statement that, in context, a reasonable listener would interpret as communicating a serious expression of an intent to inflict or cause serious harm on or to the listener (objective); and the speaker intended that the statement be taken as a threat that would serve to place the listener in fear for his or her personal safety, regardless of whether the speaker actually intended to carry out the threat (subjective).

Exhibit 5, or its equivalent, with specific intent to threaten Dr. Robert Crist, Dr. Warren Hern, Dr. Elizabeth Newhall, Dr. James Newhall, Planned Parenthood of the Columbia/Willamette, Inc., Portland Feminist Women's Health Center, doing business as All Women's Health Services, or any of them, or any of their family members, officers, agents, servants, employees, patients or attorneys;

(d) Providing additional material concerning Dr. Robert Crist, Dr. Warren Hern, Dr. Elizabeth Newhall, Dr. James Newhall, Planned Parenthood of the Columbia/Willamette, Inc., Portland Feminist Women's Health Center, doing business as All Women's Health Services, or any of them, or any of their family members, officers, agents, servants, employees, patients, or attorneys, with a specific intent to threaten, to the Nuremberg Files or any mirror web site [2] that may be created. In addition, defendants are enjoined from publishing, republishing, reproducing and/or distributing in print or electronic form the personally identifying information about plaintiffs contained in Trial Exhibits 7 and 9 (the Nuremberg Files) with a specific intent to threaten.

2. Defendants and their agents and all individuals in active concert or participation with any of them who receive actual notice of this Order and Permanent Injunction or the attached "Notice" shall promptly submit to the custody of the Court all materials in their possession, custody or control that are not in compliance with the provisions of this Permanent Injunction, except that counsel for the defendants may retain one copy of any such materials that were included in the Record of this Court.

3. Willful violation of this Order and Permanent Injunction or any other of this Court's orders may subject any person who commits such an act to criminal and/or civil prosecution for contempt of this Court. Any violation of this Order and Permanent Injunction will result in immediate issuance of an order to show cause for service on the violator, who after appropriate hearings and findings, will be dealt with within the sanctions provided by law.

4. Defendants, and their agents and all persons in active concert or participation with any of them, are hereby ENJOINED and RESTRAINED from disposing of, secreting, pledging, encumbering, conveying, transferring, damaging, mortgaging, or otherwise disposing or removing from its customary location or in any other way making unavailable to the processes of the court, any of their real property or personal property, including, but not limited to, cash, bank accounts, retirement plans, bonds, and other securities, liquid assets and personal property regardless of whether the property is held jointly with another person or individually by the defendant.

5. This Court shall retain jurisdiction of this action for all purposes, including without limitation, all proceedings involving the interpretation, enforcement or amendment of this Order and Permanent Injunction.

---

2. A "mirror web site" within the meaning of this Order means a web site created by an independent party who takes the content from a web site and reproduces it on his or her own computer ("the web server") and locates it at a different Internet address.